UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TYLER DIETER,

                Plaintiff,

-vs-

LINDSAY P. QUINTILONE,

                Defendant.

DECISION AND ORDER

12-CV-6541-CJS-MWP

**APPEARANCES**

For Plaintiff:
    Jeffrey Wicks, Esq.
    Jeffrey Wicks, PLLC
    36 West Main Street, Suite 318
    Rochester, NY 14614
    (585) 325-6070

For Defendant:
    Jeremy A. Colby, Esq.
    Michael P. McClaren, Esq.
    Ryan G. Smith, Esq.
    Webster Szanyi, LLP
    1400 Liberty Building
    Buffalo, NY 14202
    (716) 842-2800

## INTRODUCTION

**Siragusa, J.** This civil rights case is before the Court on Defendant's application for summary judgment filed on November 7, 2016, ECF No. 48, and Plaintiff's cross-motion for the same filed on December 20, 2017, ECF No. 61. For the reasons stated below, Defendant's motion for summary judgment, ECF No. 48, is granted, and Plaintiff's cross-motion, ECF No. 61, is denied.

**BACKGROUND**

Plaintiff commenced this action through a complaint filed by his mother on his behalf, Plaintiff Tyler Dieter ("Tyler") being a minor at the time. Compl., Oct. 5, 2012, ECF No. 1. Tyler filed an amended complaint on March 22, 2013, ECF No. 7, and the named defendants moved to dismiss. On October 16, 2013, the Honorable Michael A. Telesca of this Court filed a Decision and Order that dismissed all the named defendants but former Assistant District Attorney Lindsay P. Quintilone ("Quintilone"), and dismissed all the claims except those for due process claims lodged against her in her personal capacity. *L.H., individually and as parent and guardian of T.D., and T.D. v. County of Livingston*, No. 12-CV-6541, 2013 Westlaw 5656209 (W.D.N.Y. Oct. 16, 2013).

The central issue before the Court on the cross-motions for summary judgment is whether Quintilone fabricated evidence before the grand jury to obtain an indictment against Tyler. In that regard, Quintilone prosecuted Tyler for allegedly sexually abusing his then three-year-old half-sister ("the Child") in 2010 when Tyler was sixteen years old. Tyler claims that Quintilone violated the provisions of New York law that pertain to videotaping a witness statement, and keeping the proceedings of the grand jury secret.

Quintilone filed a Local Rule 56 statement, and Tyler responded to that statement, but did not file a statement of his own. In his response, Tyler noted disagreements with the defense statements. The Court adopts the defense statement of facts as modified by Tyler's factual objections.

Tyler was born to Laurie Hainey and Phil Dieter, who subsequently divorced. Tyler's father then married J.D., mother to the Child, Tyler's half-sister, who was born in 2007. Phil Dieter and J.D. did not reside together in November 2010. Tyler spent weekends at his father's house. J.D lived with her three children, including the Child, and her

mother, Lois Anne Noel, and stepfather, Harry Noel.

On Sunday, November 7, 2010, when Tyler was 16 and the Child was 3, Tyler spent time at his father's house and spent time with the Child while there. J.D. picked up the Child from the father's house on November 7, 2010, and when the Child got into J.D.'s car, she complained that her "bottom" hurt. Once at home, J.D. inspected the Child's vagina and found it red and irritated. The Child complained that Tyler had touched his finger to her "bottom," which is the term the Child used for her vagina. The Child also reported the allegation of abuse to her grandmother. The grandmother had taken the Child up to her room to read to her. "[B]efore completing the first page, the [c]hild volunteered, 'do you know what Tyler did to me, he hurt me…. [H]e touched my bottom.'" Noel Decl. ¶ 4, Nov. 78, 2016, ECF No. 48-4. J.D. called the Child's pediatrician and reported the allegations of abuse and the Child's symptoms. The pediatrician advised J.D. to take the Child to the emergency room, which she did.

At the hospital on November 7, 2010, Dr. Elizabeth Murray and Dr. Arthur Jay examined the Child in the mother's presence, and the Child repeated the allegations of abuse to the examining physicians. Dr. Murray advised J.D. to contact the Bivona Center. Def. Ex. E, Emergency Department Report (Nov. 7, 2010) at 1–2, No. 7, 2016, ECF No. 50-1. As mandated reporters, the physicians made a report of suspected sexual abuse to the REACH[1] Program at the Golisano Children's Hospital. New York State Police Investigator J. Tracy Cass ("Cass") received a report of the alleged sexual abuse via the New York State Child Abuse Hotline. Cass Decl. ¶ 4, No. 7, 2016, ECF No. 48-5. The

---

[1] Referral and Evaluation service for Abused Children, located within the Bivona Child Advocacy Center. The REACH Program (https://www.urmc.rochester.edu/childrens-hospital/community-outreach-programs/reach-program.aspx).

3

report detailed the following information:

> On the weekend of 11/07/2010, 16 year old [TD] stuck his index finger into his 3 year old sister [the Child's] vagina. The Child was examined at Strong Hospital and was found to have redness and discharge in her vaginal area. Please note the Child refers to her vagina as her bottom. This was not the first time [TD] has stuck his finger into his sisters [sic] bottom.

Cass Decl. ¶ 6.

J.D. brought the Child to the Bivona Child Advocacy Center on November 8, 2010, where Dr. Ann Leane examined her. The Child repeated her allegations of abuse by her stepbrother. Dr. Leane diagnosed erythematous genitalia.[2] Cass interviewed the Child on the same day, and the child repeated her allegations of abuse by her stepbrother, stating that it took place in the playroom while the father was cooking dinner. Cass prepared a report of her interview and recorded the Child's responses for body part identification. Cass believed the allegations of abuse because "a three-year-old would not be that consistent with her explanation of what happened if it had not happened." J.D. Dep. 77:22–25, Ex. X, Oct. 19, 2016, ECF No. 47-6; Cass Decl. ¶ 16. On November 17, 2010, Cass visited the father's house. Cass interviewed the father who confirmed that Tyler was present with the Child in the playroom in the basement on November 7. The father did not permit Cass to view the playroom. The father indicated to Cass that he would bring his son, Tyler, to the New York State Police barracks after school. He did so, and Tyler requested counsel, so no questioning took place. Cass states that she did not arrest Tyler, despite believing she had probable cause to do so because she wanted to avoid having

---

[2] "erythematous: relating to or marked by erythema"; "erythema: abnormal redness of the skin or mucous membranes due to capillary congestion (as in inflammation)"; "genitalia: the organs of the reproductive system; *especially* the external genital organs." "Erythematous, erythema, genitalia." *Merriam-Webster.com*, Merriam-Webster, www.merriam-webster.com/dictionary/erythematous. Accessed 28 Mar. 2018.

4

the Child testify at a preliminary hearing. Cass forwarded her report to the Livingston County District Attorney "for consideration of Grand Jury Presentation."[3] Cass Decl. ¶ 26.

The Livingston County District Attorney assigned two assistants to prosecute the case. One was Quintilone, who was admitted to the New York bar in 2008, and had been prosecuting traffic tickets and misdemeanors in justice courts. The Tyler prosecution was the first, or one of the first, felony cases Quintilone prosecuted. The case was assigned to her in the belief that, as a woman, she would establish trust with the Child more easily than her more experienced male colleague would. The prosecution decided to videotape the Child's grand jury testimony, as allowed by New York Criminal Procedure Law § 190.32. That statute, last amended in 2006, reads in pertinent part as follows:

> § 190.32. Videotaped examination; definitions, application, order and procedure
>
> - (1) Definitions. As used in this section:
>
>   - (a) "Child witness" means a person twelve years old or less whom the people intend to call as witness in a grand jury proceeding to give evidence concerning any crime defined in article one hundred thirty[4] or two hundred sixty or section 255.25, 255.26 or 255.27 of the penal law of which the person was a victim.
>
>   - * * *
>
>   - (c) "Operator" means a person employed by the district attorney who operates the video camera to record the examination of a child witness or a special witness.
>
> - 2. In lieu of requiring a witness who is a child witness to appear in person and give evidence in a grand jury proceeding, the district attorney may cause the examination of such witness to be videotaped in accordance with the provisions of subdivision five of this section.

---

[3] The date of the forwarding is not indicated. However, Cass stated the report was forwarded for grand jury presentation on or before November 23, 2010. Cass Decl. ¶ 26.

[4] N.Y. Penal Law art. 130 defines the sex offenses.

5

- \* \* \*

- 5. The videotaping of an examination either of a child witness or a special witness shall proceed as follows:

    - (a) An examination of a child witness or a special witness which is to be videotaped pursuant to this section may be conducted anywhere and at any time provided that the operator begins the videotape by recording a statement by the district attorney of the date, time and place of the examination. In addition, the district attorney shall identify himself, the operator and all other persons present.

    - (b) An accurate clock with a sweep second hand shall be placed next to or behind the witness in such position as to enable the operator to videotape the clock and the witness together during the entire examination. In the alternative, a date and time generator shall be used to superimpose the day, hour, minute and second over the video portion of the recording during the entire examination.

    - (c) A social worker, rape crisis counselor, psychologist or other professional providing emotional support to a child witness or to a special witness, as defined in subparagraph (ii) of paragraph (b) of subdivision one of this section, or any of those persons enumerated in paragraphs (a), (b), (c), (d), (e), (f) and (g) of subdivision three of section 190.25 may be present during the videotaping except that a doctor, nurse or other medical assistant also may be present if required by the attendant circumstances. Each person present, except the witness, must, if he has not previously taken a constitutional oath of office or an oath that he will keep secret all matters before a grand jury, must take an oath on the record that he will keep secret the videotaped examination.

    - (d) The district attorney shall state for the record the name of the witness, and the caption and the grand jury number, if any, of the case. If the witness to be examined is a child witness, the date of the witness' birth must be recorded. If the witness to be examined is a special witness, the date of the order authorizing the videotaped examination and the name of the justice who issued the order shall be recorded.

    - (e) If the witness will give sworn testimony, the administration of the oath must be recorded. If the witness will give unsworn testimony, a statement that the testimony is not under oath must be recorded.

    - (f) If the examination requires the use of more than one tape, the operator shall record a statement of the district attorney at the end of each tape declaring that such tape has ended and referring to the

6

- succeeding tape. At the beginning of such succeeding tape, the operator shall record a statement of the district attorney identifying himself, the witness being examined and the number of tapes which have been used to record the examination of such witness. At the conclusion of the examination the operator shall record a statement of the district attorney certifying that the recording has been completed, the number of tapes on which the recording has been made and that such tapes constitute a complete and accurate record of the examination of the witness.

    - (g) A videotape of an examination conducted pursuant to this section shall not be edited unless upon further order of the court.

- 6. When the videotape is introduced in evidence and played in the grand jury, the grand jury stenographer shall record the examination in the same manner as if the witness had testified in person.

- 7. Custody of the videotape shall be maintained in the same manner as custody of the grand jury minutes.

N.Y. Crim. Proc. Law § 190.32 (Consol., Lexis Advance through 2018 Chapters 1-3).

Quintilone conducted four separate interviews of the Child, each recorded by her colleague. The interviews took place at the Bivona Center on December 10, and December 17, 2010. Before the interviews began, Quintilone spent time with the Child in a playroom with toys. She conducted the actual interviews in a room with a two-way mirror. In that room, the glass appeared as an ordinary mirror. On the opposite side of the glass was an observation room where viewers could watch what was happening on the other side of the glass without being seen. Quintilone did not go into the observation room during any of the four interviews of the Child and was not aware anyone was in that room until the fourth session when she heard a knock on the glass.

During the first three interviews, the Child indicated she called her vagina her "bottom" and denied that anyone had touched her bottom. Video-recorded Interview of a Minor Child in the Above-Titled Matter, Ex. H 12:17–19, 19:10–12, Oct. 19, 2016, ECF No. 47-2. She also denied that Tyler ever played with her in the playroom at the father's

7

house. *Id.* 15:22–24. After that first interview concluded, Quintilone took the Child to her mother, and then spoke separately with her colleague, and between them, they agreed to try another interview.

In the second session, the Child revealed that her father had said she "couldn't talk about this." Ex. H 24:11, 26:14–17. Quintilone asked the Child the following questions concerning her discussion with the father to which she gave the following responses:

> Q. No? Did he tell you anything about this interview?
>
> A. No.
>
> Q. No?
>
> A. He said I couldn't talk about this.
>
> Q. He told you you couldn't talk about it?
>
> A. No.
>
> Q. Why can't you talk about it?
>
> A. Because talking about nothing here, in here, isn't—is the truth, but this is the truth.
>
> A. Telling people at here.
>
> Q. Do you want to tell the truth today?
>
> A. Yeah.

Ex. H 24:7–20. The Child also denied that Tyler touched her bottom:

> Q. Right there. And has anyone ever touched your bottom before?
>
> A. No.
>
> Q. No? Has Tyler ever touched your bottom before?
>
> A. Nope.
>
> Q. Has he ever touched your bottom before while you were at daddy's house?

8

  A. No.

*Id.* 25:6–14. Returning to the subject of what the father told her, Quintilone asked the Child the following questions and she gave the following responses:

  Q. So, did something happen at daddy's house?

  A. Yeah, I told daddy that.

  Q. Do you want to tell the truth?

  A. Yeah.

  Q. Did—did daddy ask you to tell the truth, or did he ask you to tell a lie?

  A. Tell him a lie.

  Q. He did?

  A. Yeah. But my two daddies (indiscernible) lying to daddies isn't the truth.

  Q. It isn't the truth?

  A. No.

  Q. Why would you have to lie? Why does daddy want you to lie?

  A. Because that is the truth of him, and it isn't the truth, so I told daddy that.

27:8–23. Further in the second interview, the Child testified in response to the following questions:

  Q. Has he [referring to Tyler] ever poked you in your bottom?

  A. No.

  Q. No? You don't remember him poking you in your bottom?

  A. No.

Ex. H 28:17–21.

  At the third interview on December 17, also conducted in the same location, the Child again denied that Tyler had ever poked her in the bottom. Ex. H 46:20–21. The

interview recessed at 11:04 a.m. and Quintilone took the Child to the playroom, where she made a connection between the cartoon character "Arthur" and Dr. Arthur Jay, one of the doctors who had examined her at the hospital when she first alleged abuse. After a private discussion together with her colleague, Quintilone decided to interview the Child once again, and to start with questions focused on Dr. Jay.

The transcript for the fourth interview begins with the Child and Quintilone talking about the mirror in the room. At that point, the following took place:

MS. QUINTILONE: And what else is there? That's a big mirror, isn't it?

THE CHILD: Yeah.

MS. QUINTILONE: Did you see yourself in the mirror? Come here. Do you hear something?

THE CHILD: Yeah, mommy.

MS. QUINTILONE: That's right. Wave.

THE CHILD: What's she doing?

MS. QUINTILONE: She's tapping on the window. Do you hear it?

THE CHILD: Yeah.

MS. QUINTILONE: Yeah?

THE CHILD: Why is she?

MS. QUINTILONE: She's letting you know that she's right there.

THE CHILD: Oh.

MS. QUINTILONE: Okay? So, if you get scared, you can just tell her, because she can hear you. She can hear you in that room. You can just say, "Mom, I'm scared."

THE CHILD: (Indiscernible).

Ex. H 59:10–60:6. At the time, Quintilone believed that Cass was knocking on the glass, not the Child's mother. Quintilone Dep. 134:25–135:21, 139:9–12, Nov. 7, 2016, ECF No. 50-2. However, she told the Child that it was her mother to make the Child feel safe. *Id.*

Quintilone raised the topic of the Child's visit to Dr. Jay (whom she referred to as Dr. Arthur) and the Child responded that she saw him for her "bottom" because "it hurted." The questions and answers continued as follows:

> Q. Yes? So, when you went to see Dr. Arthur, what did you go to see him for?
>
> A. My bottom.
>
> Q. Your bottom? And what was wrong with your bottom?
>
> A. It hurted.
>
> Q. Why did it hurt?
>
> A. Because Tyler did it.
>
> Q. What did Tyler do to your bottom?
>
> A. He poked me.
>
> Q. He what?
>
> A. He poked me.
>
> Q. He poked you? What did he poke you with?
>
> A. His pinky finger.

Ex. H 61:3–16. The Child stated that she had not told Quintilone earlier about Tyler's poking her because she was scared of doing so. Ex. H 62:10–15. She further stated that when Tyler touched her on her bottom, she was in the playroom at the father's house. She said that the father was in the kitchen washing dishes. Ex H 63. She then denied that Tyler had ever poked her in her bottom, Ex. H. 65:11–12, after which Quintilone asked her the following questions and the Child gave the following responses:

> Q. No? What did we just talk about?
>
> A. My bottom.
>
> Q. That's right. Did he poke you in your bottom?
>
> A. Only once.
>
> Q. Only once?
>
> A. Or twice.
>
> Q. Or twice? Did he say anything when he poked you?
>
> A. He says "Sorry."

Ex. H 65:13–23. Quintilone then questioned the Child as to why she had not revealed the information earlier:

> Q. No? Why didn't you tell me before now?
>
> A. Because.
>
> Q. Because why?
>
> A. Because I didn't want to.
>
> Q. You didn't want to? Did somebody tell you not to tell me?
>
> A. Yeah, daddy did.
>
> Q. He did?
>
> A. Mm-hmm.
>
> Q. When did he tell you that?
>
> A. When I was at his house.…
>
> Q. —if you told me? What was going to happen to you?
>
> A. He told me that I would get in trouble.

Ex. H 67:8–18, 22–24. At the end of the fourth interview, Quintilone told the Child, "[Y]ou're such a brave girl for telling us the truth. And I think you're going to get some ice cream." Ex. H. 72:2–3.

Quintilone presented the case to the grand jury on February 9, 2011. The grand jury heard testimony from the Child's mother and Dr. Ann Leanne, and viewed the Child's videotaped testimony. Quintilone played the sessions out of sequence, playing the fourth session first, followed by the first three sessions. To introduce the video, Quintilone told the Grand Jury the following:

> I would like to play a portion of the video for you. The entire interview with [the Child], which spans over two different dates, is quite lengthy. So that we don't fall behind in our schedule this morning, I would like to play the relevant portion of her interview. You will also be viewing, later this afternoon, the entire portion of the video when we have some more time to play that. But for purposes of right now, I'd just like to play you the relevant portion of the video.

*People v. Tyler Dieter*, Grand Jury transcript 22:19–23:4, Oct. 19, 2016, ECF No. 47-3. The grand jury voted to indict Tyler on February 23, 2011, for endangering the welfare of a child (N.Y. Pen. L. § 260.10(1), a class A misdemeanor), and aggravated sexual abuse in the second degree (N.Y. Pen. L. § 130.67, a class C felony).

Tyler was arrested on March 3, 2011, when he surrendered to the New York State Police. His arrest was based on an indictment warrant dated February 24, 2011, signed by a state judge. Tyler was arraigned the same day and remanded to custody in lieu of $50,000 cash or $100,000 bond bail. Tyler was taken to the Livingston County Jail where he remained for five days until March 8, 2011, when his sister posted bail for him. The same judge who issued the indictment warrant dismissed the indictment on the defense motion. The state judge found that the prosecution had violated N.Y. Criminal Procedure Law § 190.32 because Quintilone told the Child that her mother could hear her.

Tyler asserts a procedural due process claim against Quintilone. He argues that Quintilone violated his rights by the following:

13

(1) telling the Child that her mother "could hear her grand jury testimony during the fourth videotape session"; (2) allowing the Child's mother, Inv. Cass, and a social worker to hear the Child's "grand jury testimony during the fourth videotape session, assuming that she did so"; (3) allowing the Child's mother to communicate with her "during her grand jury testimony during the fourth videotape session"; (4) promising ice cream to the Child after her grand jury testimony; and (5) presenting the Child's "grand jury testimony out of order and instructing the grand jurors that the fourth session was the only relevant session." Ex. C at #7.

Pl.'s Response to Def.'s Rule 56 Statement ¶ 201, Dec. 20, 2017, ECF No. 61-2.

## STANDARD OF LAW

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, … demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a) (2015). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may

only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**ANALYSIS**

Judge Telesca's decision on the defense motion to dismiss held open the question of whether Quintilone is entitled to absolute immunity for the issues surrounding the videotaped testimony and grand jury presentation. Citing to *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995), Judge Telesca wrote: "Should discovery reveal that Quintilone's actions in procuring the fourth videotape were an attempt to fabricate evidence implicating [Tyler], Quintilone would not be entitled to absolute immunity. *Id.*" J. Telesca Decision and Order 10. After reviewing the papers submitted on the pending cross-motions, and hearing oral argument, the Court finds no issue of fact which would preclude precluding summary judgment. The evidence before the Court on this motion shows that the police had probable cause to arrest Tyler well before the videotaping of the Child's testimony.

On November 8, 2010, Cass, an investigator with the state police, received a detailed report alleging sexual abuse of the Child by Tyler. Cass Decl. ¶ 6. The Child had reported to her mother the prior evening that Tyler had touched her vagina with his finger. *Id.* ¶ 9. The mother took the Child to the emergency room and two medical doctors observed that her vulva was swollen and red. *Id.* ¶ 10. Cass interviewed the Child and she disclosed to the investigator that Tyler had used his pinky finger to touch her vagina at the father's house. *Id.* ¶ 14. Cass, based on her years of experience, concluded that the Child was not fabricating a story. *Id.* ¶ 16. On November 15, 2010, another medical doctor confirmed that the redness and swelling of the Child's vagina was due to contact irritation.

15

*Id.* ¶ 17. Cass interviewed the father on November 17, 2010, who confirmed that Tyler was with the Child in his house on November 7, 2010, the day the Child stated he had touched her vagina. Cass concluded she had probable cause to arrest Tyler on November 17, 2010. *Id.* ¶ 21. Tyler has been the only suspect in this case.

In *Hill v. City of New York*, 45 F.3d 653, 657 (2d Cir. 1995), which was not a summary judgment case, the Second Circuit determined that the defendant was entitled to absolute immunity for the following alleged acts: "(3) maliciously prosecuting [the plaintiff]; (4) conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury…." *Id.* at 661. It held also that "efforts to manufacture evidence that occur during the investigatory phase of a criminal case," are not protected. "Hence, if the videotapes were made to collect or corroborate evidence against Hill in order to get probable cause to arrest her, the act of making the tapes receives only qualified immunity." *Id.* at 662. Further, "if before obtaining Joseph's second videotaped statement Adago lacked probable cause to arrest Hill, and the results of that interview contributed to his finding probable cause, the interview would then be held to be an investigatory function." *Hill*, 45 F.3d at 663. *Hill* is distinguishable on its facts. In that case, the prosecutor did not know who had abused the child victim, Joseph. Joseph told an examining doctor, who found a piece of wood in his rectum, that "Big Jesse and Little Jesse put the wood inside him." *Hill*, 45 F.3d at 657. The doctor did not report the abuse. When the prosecutor interviewed him, Joseph said that his former foster mother had inserted the wood in his rectum. *Id.* Despite this, the prosecutor filed a report of suspected child abuse against Joseph's mother, and lied that the mother had also used a stick to abuse Joseph and his younger

brother. When recording Joseph's interview with a video camera, the prosecutor instructed Joseph to state that his mother beat him with a stick, and then inserted it into his anus. When the prosecutor asked Joseph how the wood got into his anus, Joseph started to state that it was his former foster brother, "Little Jesse," at which point the prosecutor ordered that the video recording be stopped. In another recording session, the prosecutor was successful at getting Joseph to accuse his mother. *Id.* at 658. The prosecutor then filed a statement with the court to the effect that no exculpatory material existed, which was untrue.

In contrast to the situation in *Hill*, Quintilone already possessed probable cause to arrest Tyler *before* she made the videotapes of the Child. Cass' investigation fully supports this conclusion. Based on the facts presented on these cross-motions, the Court determines as a matter of law that Quintilone was acting in her advocacy role, not an investigatory one. Consequently, she is entitled to absolute immunity for the videotaping sessions, and presentation to the grand jury.

Tyler's argument, presented in his reply brief at 2, that "both the police and the prosecution refused to arrest Tyler based upon the evidence which they purportedly had prior to the indictment," is without support. Quintilone and Cass both stated that no arrest took place until after indictment in order to spare the Child from having to appear in court. As a matter of discretion, Cass could have arrested Tyler for a felony before presenting the case to the grand jury, and Quintilone could have declined to go forward with a preliminary hearing, thus avoiding exposing the Child to testifying in court. N.Y. Crim. P. L. § 180.10(2). That they did not do so does not abrogate the evidence that supplied prob-

able cause to arrest Tyler before videotaping the Child. While some of Quintilone's methods may have been ill advised, the Court finds that she did not act in an investigatory role when videotaping the Child, playing the videotapes out of order to the grand jury, or instructing the grand jury that only the fourth session was relevant. During all those acts, Quintilone was acting in her advocacy role and is, therefore, entitled to absolute immunity.

## CONCLUSION

For the foregoing reasons, Quintilone's motion for summary judgment, ECF No. 48, is granted, and Tyler's cross-motion, ECF No. 61, is denied. The Clerk will enter judgment for Defendant Lindsay P. Quintilone and close this case.

IT IS SO ORDERED.

Dated: April 13, 2018
       Rochester, New York

                             ENTER:    /s/ Charles J. Siragusa
                                              CHARLES J. SIRAGUSA
                                              United States District Judge